UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHERROD LEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  4:11CV1632 TIA |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On November 2, 2009, Plaintiff filed an application for Supplemental Security Income Benefits, alleging that his disability began on May 1, 1999, before he was 22 years old, due to schizophrenia.  (Tr. 65, 147-67)  The application was denied on May 11, 2010, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 62-68, 73-74)  On April 12, 2011, Plaintiff testified at a hearing before the ALJ.  (Tr. 22-61)  In a decision dated April 25, 2011, the ALJ found that Plaintiff had not been under a disability since November 4, 2009, the date he filed his application.  (Tr. 9-17)  The Appeals Council denied Plaintiff's request for review on August 19,

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

2011. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel, who first examined Plaintiff. Plaintiff was 31 years old at the time of the hearing and lived at a group home. He testified that he was not mentally prepared to move into his own apartment. Plaintiff had chores in the group home consisting of restocking the soda machine and giving the change to the facility director. Someone at the home prepared his meals, but Plaintiff did his own laundry. Plaintiff further testified that he had a ten-day-old child. Plaintiff completed the 10th grade. He did not receive any special education but did have a resource teacher from 6th grade until he dropped out of school. The resource teacher made sure Plaintiff did his homework and helped him understand math and spelling. (Tr. 25-29)

Plaintiff further testified that he attended vocational rehabilitation through the Independent Center, which was a facility that helped people with mental illnesses to find jobs. Plaintiff started receiving vocational rehabilitation services from Independent Center in August 2008. At the time of the hearing, Plaintiff was employed at Home Goods. For the past two years and eight months, he worked four hours a day, five days a week for a total of 20 hours a week. Plaintiff received $7.96 an hour. Plaintiff got the job through the Independent Center, and a job coach checked on him during the first six months of employment. Plaintiff's duties included opening boxes, taking out merchandise, and placing the merchandise on a tank for the supervisors to display in the store. Plaintiff only worked in the back room and had never worked on the floor. In addition to working at Home Goods, Plaintiff worked in the dietary department of the State Hospital while he was a

patent there.  Plaintiff worked 20 hours a week and made $9.00 per hour.  Further, Plaintiff previously worked at a company that manufactured bug spray.  His duties included putting tops on the spray bottles and placing the bottles in boxes for shipping.  (Tr. 29-33)

Plaintiff stated that his schizophrenic mental disease prevented him from being able to work full time.  He testified to experiencing racing thoughts and slacked off during work by telling the back room supervisor that he had to use the restroom.  Plaintiff needed more than the designated 15-minute break because the task was constantly going, his mind was constantly racing, and he needed to get away and calm down.  Plaintiff required these breaks two or three times a week.  These breaks usually lasted about five or ten minutes.  Plaintiff was particularly frustrated with opening picture frames, wall decor, and furniture, then coding items over $49.99.  Plaintiff had been treated by BJC Behavioral Health since he was released from the State Hospital in October 2009.  A community support worker, Konjit Avent, saw Plaintiff twice a month.  Plaintiff explained that the racing thoughts caused him to become nervous and think he was not completing the task at hand.  Plaintiff heard songs in his head but no voices.  He had no suicidal or homicidal thoughts, or any thoughts of paranoia.  Plaintiff was able to sleep only with the help of Trazodone and Doxepin because he was paranoid of the group home.  He initially experienced morning grogginess with the Doxepin but was used to the medication at the time of the hearing.  (Tr. 33-36)

Plaintiff further testified that he did not drive a car because he failed the driver's test.  Plaintiff was trying to get his GED.  With regard to physical problems, Plaintiff mentioned that he got cramps in his legs from standing and in his hands from opening boxes.  However, he had not seen a doctor.  Plaintiff took a bus to the Independent Center and BJC Behavioral Health.  He went to the Independent Center every Wednesday for team meetings and to BJC about three times a month.

Plaintiff was able to dress himself.  He did not do any grocery shopping, yard work, or housekeeping at the group home.  He had a small room at the home.  (Tr. 36-39)

The ALJ also questioned the Plaintiff, who testified that the mother of his child also lived in St. Louis.  They saw each other often, but she had been unable to travel since the baby was born.  Plaintiff sometimes took the bus to her apartment.  They had been dating about 2 years and saw each other every weekend before the baby was born.  Plaintiff had only seen his daughter in the hospital.  (Tr. 39-40)

With regard to his GED studies, Plaintiff stated that he had trouble comprehending language arts, reading, and poetry, so he was primarily working on those areas.  He received help twice a week from an activity therapist at the group home.  Over the past two years and eight months, Plaintiff had arrived late to work, but only seldom.  He received six tardies during the current year for over sleeping.  His employer gave verbal warnings.  Plaintiff stated that the latest he arrived was about 45 minutes late.  With regard to the unscheduled breaks, Plaintiff testified that he would go to the restroom, collect himself, and return to work.  In addition, Plaintiff acknowledged a history of illegal drug use.  He had been clean and sober for nearly 11 years and was tested regularly for drugs.  (Tr. 40-4)

Plaintiff further testified that his part-time job at Home Goods began as a six-month requirement through the Independent Center.  However, because the managers like him, they asked him to work full time, but only work part-time hours as a processor.  According to Plaintiff, the Independent Center and the state hospital required that he only work 20 hours a week.  However, he did not know the reason for this requirement.  Plaintiff mentioned that Home Goods was aware of his mental illness and the Independent Center team coach's instruction that Plaintiff could only

work 20 hours a week. A job coach, Heather Young, continued to check on Plaintiff once a week at Home Goods. To the best of Plaintiff's knowledge, he had not been reported to the state hospital as someone having problems. (Tr. 45-47)

In addition to Plaintiff's testimony, the ALJ heard testimony from Konjit Avent, the community support worker for Plaintiff. Ms. Avent testified that she had been involved with Plaintiff since January of 2011. She saw him twice a month, when Plaintiff came into the office. Ms. Avent stated that Plaintiff had not had any positive urine drops. With regard to his ability to work on a full time basis, Ms. Avent opined that Plaintiff had some comprehension liabilities which included the need to explain things to Plaintiff in a certain way and to remind him to stay on task. Ms. Avent was not working with Plaintiff on his GED but believed he received help from a program at the home. (Tr. 48-49)

In addition, a vocational expert ("VE") testified at the hearing. The VE first asked the ALJ to clarify the weight he lifted in his various jobs. Upon questioning by the ALJ, the Plaintiff answered that he did not lift much while working at Kempseeco because he used a fork wheeler. His position at Home Goods involved a processing line and bulk lifting as a group for heavier items. He testified that he lifted 50 pounds by himself but required help for any weight greater. However, Plaintiff did not lift 50 pounds very often. Plaintiff testified that two days out of the week required moving items from the truck. He and his co-workers only moved the heavy items from the truck for about 30 minutes during the day. (Tr. 50-53)

The VE then testified that Plaintiff's past jobs included dishwasher, which was unskilled, medium work; hand packager, which was also unskilled, medium work; vending machine coin collector, which was semi-skilled, medium work; retail cashier/stocker/store keeper, which was semi-

5

skilled, light work; and stock clerk retail trade, which was semi-skilled and heavy work. (Tr. 53-54)

The ALJ first asked the VE to assume a hypothetical individual capable of performing simple, routine and repetitive tasks with a need to work in a low-stress environment involving only occasional changes in the work setting and occasional decision making. Additionally, the individual could only have occasional interaction with the public and co workers. The person had no exertional limitations. When asked whether the individual could perform any of Plaintiff's past relevant jobs, the VE stated that the vending machine coin collector position would be eliminated due to contact with the public and coworkers. The person could work in stock clerk retail trade, as a dishwasher, and as a hand packager. (Tr. 54-55)

For the second hypothetical, the ALJ asked the VE to assume the same limitations as the first hypothetical, with production quotas based on end-of-the day measurements rather than ongoing quotas throughout the course of the workday. The VE testified that none of the past work mentioned in the first hypothetical would be affected because the jobs did not have strict quotas. Other jobs which would fit the criteria in hypothetical two included linen room attendant, which was classified as medium work, and kitchen helper, which was also medium work. These jobs existed in large numbers in the national economy and in Missouri. With these entry level jobs, an individual could be off task only about 10 percent of the day, in addition to regularly scheduled breaks, to remain employed. If the person were off task for more than 10 percent, the VE opined that he or she would likely lose the job, or the employer would be less lenient in other areas such as tardiness or missing work, causing the individual to eventually get fired. (Tr. 55-57)

For the third hypothetical, the ALJ asked the VE to add to hypothetical number two the fact that the individual may be an average of 30 minutes tardy to work one to two times a month. The

VE testified that an employer would not generally accept that in the work place such that the person would be at risk for losing his or her job. (Tr. 57-59)

The attorney also questioned the VE, who testified that if a person needed a job coach, that would be inconsistent with competitive employment. In addition, the VE stated that the positions of linen room attendant and kitchen helper required reasoning of either carrying out instructions provided in written or oral form or carrying out common sense instructions provided orally or written. (Tr. 59-60)

A Disability Report dated October 28, 2009 indicated that Plaintiff was unable to concentrate or get along with co workers and that he was paranoid. He saw Doctors Mallya and Peters for schizophrenia. He was able to clean, set the table, and do laundry. His recreational activities included watching TV and playing pool. His relatives visited him, and he took trips with other clients. (Tr. 223-26)

In a Function Report – Adult, Plaintiff reported that he lived in a group home. On a typical day, he woke up at 5:30 a.m. and got ready for work. He rode the bus to work and worked from 9 a.m. to 1 p.m. He also went to NA and AA meetings. He took a shower, took his medication, then went to bed. Prior to his illness, he could remember things and pay attention for long periods of time. Now, he had trouble falling asleep at night. He did not need grooming or medication reminders. Plaintiff could make a sandwich for work and perform household cleaning and laundry. He went outside daily and used public transportation to travel. In addition, Plaintiff was able to shop in stores for toiletries. He enjoyed listening to music and watching sports. He spent time with his family and girlfriend, as well as talked on the phone with them. He reported that he had no problems getting along with family, friends, neighbors, or others. Plaintiff's illness affected his memory, completing

7

tasks, concentrating, understanding, and following instructions. Specifically, he stated he had difficulty paying attention on a task. He could actively move on a task for 1 hour. He had to read written instructions a couple times but did better with spoken instructions. Plaintiff got along well with bosses and had never been fired from a job due to problems getting along with others. However, he did not handle stress or changes in routine well. (Tr. 243-50)

### III.  Medical Evidence

On October 27, 2009, Dr. Ashok Mallya completed a Medical Report on behalf of the Missouri Department of Social Services. Dr. Mallya diagnosed schizophrenia, paranoid type; and alcohol, cocaine, and cannabis dependence by history. In addition, Dr. Mallya opined that Plaintiff's functional capacity included low stress tolerance. Plaintiff was also easily irritated and paranoid, could not get along with others, and needed support to comply with medication. (Tr. 413-14)

Plaintiff was admitted to the St. Louis Psychiatric Rehabilitation Center on December 12, 2005 after being charged with two counts of Second Degree Assault of a law enforcement officer. The St. Francois County Circuit Court found him not guilty by reason of insanity and committed him to the psychiatric rehabilitation center. Plaintiff's diagnosis on admission was Schizophrenia, disorganized type. He was conditionally released on July 9, 2009 and discharged on October 27, 2009. His discharged diagnosis was Schizophrenia, paranoid type; alcohol and cocaine abuse by history; cannabis dependence by history; personality disorder, NOS; and a GAF of 70. Dr. Mallya recommended that Plaintiff continue his medication regimen; continue group and individual therapy; and reside at Labre RCF. (Tr. 294-98)

Gloria V. Jourdan, MSW, LCSW, an intake specialist at BJC Behavioral Health assessed Plaintiff on November 13, 2009. Plaintiff denied any particular symptoms during his session but

noted that when he was first diagnosed, he thought he could talk to dead people, and he was very violent. Plaintiff reported that he worked in the back room at Home Goods. He lived at Labre, a residential care facility and transitional home. Ms. Jourdan's clinical impressions noted that Plaintiff had reasonable insight into his condition. He possessed average intellect and could particiapate in his own treatment. Diagnoses included Schizophrenia, paranoid type; polysubstance abuse vs. dependence remission; and a GAF of 65. (Tr. 422-432)

On November 23, 2009, Dr. Akinkunle Owoso, a psychiatrist, examined Plaintiff for advisement/follow-up psychiatric care through BJC Behavioral Health. Plaintiff reported having no psychotic symptoms in the form of auditory hallucinations, grandiosity in thoughts, or delusions over the past 3 to 4 years. He believed his past hallucinations, delusions, and paranoia could have stemmed from drug use. Plaintiff further reported being stable on Geodon for years. Upon examination, Plaintiff's mood was good, and his affect was restricted but stable and reactive. His reasoning, insight, and judgment were fair to good. Dr. Owoso noted that while possible that Plaintiff's psychotic symptoms resulted from drug-induced changes to the central nervous system, that diagnosis was not clear. Dr. Owoso diagnosed psychotic disorder, NOS, rule out substance-induced psychotic disorder, and a GAF of 71-75. Plaintiff was to continue on Geodon and paroxetine, continue psychotherapy, receive psychosocial intervention, exercise good sleep hygiene, and return to the clinic in one to two months. In addition, Dr. Owoso advised Plaintiff to remain in contact with his community support worker and the forensic case manager. (Tr. 434-39)

Progress notes from BJC Behavioral Health dated January 4, 2010 revealed that Plaintiff had been doing well since his last appointment. He was diagnosed with psychotic disorder, NOS and advised to follow up in two months. (Tr. 446) On March 1, 2010, Plaintiff's diagnosis remained the

9

same. (Tr. 447)

On May 11, 2010, Ricardo Moreno, Psy.D., completed a Psychiatric Review Technique based upon the medical disposition of Schizophrenic, Paranoid, and Other Psychotic Disorders. Dr. Moreno noted mild restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace. In addition, Plaintiff had moderate difficulties in maintaining social functioning and experienced one or two repeated episodes of decompensation, each of extended duration. Based on the medical and lay evidence, Dr. Moreno found that Plaintiff's impairment was more than non-severe. He considered Plaintiff's symptoms partially credible. (Tr. 449-59)

Dr. Moreno also completed a Mental Residual Functional Capacity Assessment form. He assessed moderate limitations to Plaintiff's ability to remember locations and work-like procedures and ability to understand and remember detailed instructions. Further, Plaintiff had moderate limitations to his ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff's ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes were also moderately limited. Further, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. Dr. Moreno opined that Plaintiff must avoid work involving close proximity to controlled substances, as well as highly stressful and/or detailed work. Plaintiff was able to understand, remember, carry out, and persist at simple tasks; make simple, work-related judgments; and relate adequately to co-workers

10

and supervisors. (Tr. 460-62)

Plaintiff saw Dr. Ujjwal Ramtekkar on August 24, 2010 for a follow up visit. Progress notes indicated that Plaintiff last saw Dr. Owoso in June, 2010. Dr. Ramtekkar noted that Plaintiff was partially reliable but was a poor historian. Plaintiff reported that things had been going pretty well. Dr. Ramtekkar also noted that Plaintiff had no decompensation or worsening of psychotic symptoms and had been stable on Geodon, Paxil, and doxepin. Mental status exam revealed regular speech; logical flow of thought; good mood; and restricted, but stable and reactive, affect. His insight and judgment were fair to good, and he had no deficits in his ability to calculate, memory, recall, naming, attention, or concentration. He had some concreteness in his abstract reasoning. Dr. Ramtekkar found that Plaintiff was doing well with no side effects from his current medication regimen. He was stable for outpatient treatment. Dr. Ramtekkar assessed psychotic disorder, NOS, rule out substance induced psychotic disorder, and a GAF of 60 to 70. Dr. Ramtekkar planned to continue Plaintiff's medications and noted that Plaintiff had no acute psychosocial issues, as he had stable living conditions, income, and relationships. (Tr. 628-31)

Progress notes dated October 19, 2010 indicated that Plaintiff reported stable symptoms with no recent decompensation. He was compliant with medications and reported no side effects or limitation in his daily routine. He denied psychotic symptoms since his last visit. His grooming and hygiene were fair, and his demeanor was cooperative. Examination was normal. Dr. Ramtekkar found that Plaintiff was stable symptomatically and appeared to be compliant with medications. No evidence of acute decompensation existed. (Tr. 632-34) The assessment remained the same during an office visit on November 16, 2010. Dr. Ramtekkar assisted Plaintiff in completing his disability paper work. (Tr. 635-37) On January 18, 2011, Plaintiff reported that he planned to move out of

the group home and stay in his own apartment. (Tr. 638-40)

## IV. The ALJ's Determination

In a decision dated April 25, 2011, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 4, 2009, the application date. He had the severe impairments of psychotic disorder, not otherwise specified, and polysubstance dependence, in full sustained remission. The ALJ noted that, notwithstanding Plaintiff's mental history and diagnosis, psychiatric examinations had been unremarkable, with GAF scores ranging from 60 to 75. The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ assessed Plaintiff's mental impairments under paragraph B and paragraph C criteria and found that Plaintiff failed to satisfy that criteria. However, the ALJ used the paragraph B limitations to rate the severity of Plaintiff's impairments and formulate Plaintiff's residual functional capacity ("RFC"). (Tr. 9-14)

After carefully considering the entire record, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, with nonexertional limitations. Plaintiff could perform simple, routine, and repetitive tasks involving low stress. The low stress tasks were defined as having only occasional decision making and occasional changes in the work setting, while performing work that established only production quotas that were based on end of the day work measurements. The ALJ found that Plaintiff's allegations of disabling symptoms were inconsistent with the RFC assessment. In addition, the ALJ found significant the lack of clinical findings and Plaintiff's ability to engage in a variety of daily activities, including working at Home Goods. The ALJ discounted the opinion of Dr. Mallya because Dr. Mallya had examined Plaintiff only once at that

time, and the limitations were incongruous with later statements by Dr. Mallya. (Tr. 15-16)

The ALJ thus found that Plaintiff was capable of performing his past relevant work as a dishwasher, hand packager, retail cashier, and stock clerk. The ALJ relied on the VE's testimony to make that determination. Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since Plaintiff's application date of November 4, 2009. (Tr. 16-17)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th

13

Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s).  Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record.  Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence.  Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

### VI.  Discussion

Plaintiff raises three arguments in his Brief in Support of the Complaint. First, he argues that the ALJ failed to rely on some medical evidence in formulating Plaintiff's RFC. Second, Plaintiff asserts that substantial evidence does not support the ALJ's determination because the hypothetical question to the VE did not capture the concrete consequences of Plaintiff's impairment. Finally, Plaintiff contends that the VE's testimony is contrary to the Dictionary of Occupational Titles ("DOT"), and the ALJ must resolve the inconsistency on remand. Defendant, on the other hand, argues that the ALJ properly determined the degree of Plaintiff's mental impairment in assessing Plaintiff's RFC and properly determined that Plaintiff could perform his past relevant work. The undersigned finds that the ALJ failed to properly assess Plaintiff's RFC.

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum*

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).  Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . . .").  In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted).  The ALJ may not rely upon his or her own inferences. Id. at 858.

Here, while the ALJ did assess Plaintiff's daily activities and hearing testimony, the RFC

16

determination does not contain a narrative with supporting medical evidence. Specifically, to support the RFC finding, the ALJ thoroughly discusses Plaintiff's daily activities, part-time position at Home Goods, and poor earnings record, as well as his testimony regarding slacking off during work and being tardy. (Tr. 15-16)   However, the ALJ then places nominal weight on Dr. Mallya's October 2009 opinion indicating functional limitations because, although she was Plaintiff's treating source, Dr. Mallya had only examined Plaintiff once at the time of the statement. Further, the ALJ discredits the opinion because Dr. Mallya based the opinion on Plaintiff's subjective complaints and because it was inconsistent with subsequent statements from Dr. Mallya. However, in setting forth the credible limitations, the ALJ fails to mention any supporting medical evidence for the RFC determination. Indeed, the ALJ relies heavily on the absence of medical evidence yet does not mention any evidence from medical sources regarding Plaintiff's ability to function in the workplace.     Other than Dr. Mallya's October 2009 medical report and the statement from the non-examining physician,[3] the record contains no medical opinion regarding how Plaintiff's impairments affect his ability to function in the workplace, and the ALJ may not rely upon his own inferences from the medical reports. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Despite ongoing psychiatric care and

---

[3] "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2002).  The SSA regulations recognize that "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3).  Here, the ALJ makes no mention of the specifics regarding the non-examining physicians' opinions but merely states he weighed the opinions as non-examining expert sources. (Tr. 16)  Indeed, Dr. Moreno cites no specific medical findings to support his functional capacity assessment. (Tr. 452)

prescriptions for psychotropic medications, as well as the need to live in group housing, none of Plaintiff's treating psychiatrists speak to Plaintiff's ability to perform sustained work activities. "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited his ability to engage in work-related activities."  Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001) (citation omitted).  The treating psychiatrists at BJC Behavioral Health are best suited to provide medical support for Plaintiff's RFC.  Thus, the ALJ should re-contact these doctors and seek information regarding Plaintiff's ability to perform work-related activities.

The Court finds, therefore, that substantial evidence does not support the ALJ's RFC determination.  As a result, this case should be remanded to the ALJ for further development of the record and proper assessment of the evidence, including a restated hypothetical to the VE.  On remand, the ALJ should re-contact Plaintiff's treating psychiatrist(s) for further clarification and/or explanation of Plaintiff's limitations and their relationship to his ability to perform work-related activities.  Once the ALJ properly determines Plaintiff's RFC and supports that RFC with substantial medical evidence, the ALJ should re-contact the VE and pose a hypothetical reflecting that RFC.  "A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant."  Hutton v. Apfel, 175 F.3d 651, 656 (8th Cir. 1999).  Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and that the case be **REMANDED** for further consideration

consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of March, 2013.